J. L. McGRAW, ADMINISTRATOR OF THE ESTATE OF W. R. PENDRY, v. SOUTHERN RAILWAY COMPANY AND F. T. DUGGINS.

(Filed 26 February, 1936.)

**1. Appeal and Error L a—**

The decision of the Supreme Court on a former appeal constitutes the law of the case, both in subsequent proceedings in the trial court and upon a subsequent appeal.

**2. Master and Servant E b: E c—Evidence held for jury on issues of negligence and assumption of risk under Employers' Liability Act.**

Evidence tending to show that plaintiff's intestate, a flagman on defendant's train, was standing on the rear platform of the train as the train was backing out of a switch in shifting operations, that he was required to be at such place in the course of his employment, and that he was thrown therefrom to the track by a violent, sudden, unusual, and unnecessary jerk when the engineer decreased the speed of the train from five or six miles per hour to one mile per hour in two car lengths, and that the train continued backing after it had been thus slowed down, and ran over and killed plaintiff's intestate as he lay upon the track, where he had been thrown by such unnecessary and violent jerk, and that the end of signal whistle had broken off in intestate's hand as he was holding on to it as a handhold in accordance with the custom of defendant's employees, and that the signal whistle was defective, causing it to thus break off as intestate was holding on to it, and depending on it to protect him from the movement of the train, *is held* sufficient to be submitted to the jury upon the issues of negligence and assumption of risk in an action under the Federal Employers' Liability Act, an employee under the act assuming only the risk of ordinary jolts and jars, but not unusual, violent, and unnecessary ones.

**3. Bill of Discovery A b—**

By the terms of the statute, N. C. Code, 902, evidence elicited from a witness upon examination prior to trial under the provisions of N. C. Code, 900, may be read at the trial.

**4. Bill of Discovery A a—**

The old equitable bill of discovery has been abolished by statute and examination of the adverse party substituted therefor, and the statute is remedial and should be liberally construed. N. C. Code, 899, *et seq.*

5. **Bill of Discovery A b—Party is not entitled to cross-examine witnesses at trial upon reading of their testimony taken upon prior examination.**

Where the examination of witnesses prior to trial is had under the provisions of N. C. Code, 900, *et seq.*, and the testimony elicited from the witnesses read at the trial, the party against whom such evidence is introduced is not entitled as a matter of right to cross-examine such witnesses, although they are present at the trial, the right to object to the competency of the evidence and cross-examine the witnesses being available to the party only at the time the examination of the witnesses is had.

6. **Evidence K b—**

The admission of testimony of experienced trainmen, found by the court to be experts, as to the cause and effect of the stopping of a train from a given speed to a given lower speed, within a certain distance, *is held* without error.

7. **Appeal and Error B b—An appeal will be determined in accordance with the theory of trial in the lower court.**

Where, in an action brought under the Federal Employers' Liability Act against the railroad company and the engineer of the train to recover for plaintiff's intestate's death, the individual defendant admits the allegation of the complaint that intestate was killed while engaged in interstate commerce, and the individual defendant does not object to the submission of the usual issues in an action under the Federal Act, or request special instructions on the issue of damages, the individual defendant may not contend in the Supreme Court that the damages recoverable against him should not have been determined in accordance with the Federal Act.

DEVIN, J., took no part in the consideration or decision of this case.

STACY, C. J., dissents.

APPEAL by defendants from *McElroy, J.,* and a jury, 15 October, 1934. From FORSYTH. No error.

This is an action for actionable negligence, brought by plaintiff against defendants, alleging damage. The evidence on the part of plaintiff and his contentions are to the effect: That the deceased, W. R. Pendry, was a man of forty-four years of age, earning about $225.00 per month, in good health, and while in the line of duty as an employee of the defendant Southern Railway, was killed, due to the negligence of the defendant railway and the defendant F. T. Duggins, the engineer, by being run over by the train upon which he was employed. That the deceased left Winston-Salem on the night of 16 April, 1932, as a flagman on the defendant Southern Railway Company's train, and carried out his duties on the said train as it went south to its destination at Mooresville, North Carolina. That the train left Mooresville, North Carolina, as number fifty-two, about 4:10 a.m., on the morning of 17 April, 1932, and came north to Barber's Junction, reaching there about 4:40 a.m. That the train pulled into the west "Y" switch at Barber's Junction, set off one car, and left twenty cars to be brought on to

Winston-Salem, sitting on the west "Y." That the deceased, together with other members of the train crew, spent about an hour switching there at Barber's Junction, making up the rest of the train to be brought into Winston-Salem, which, after being assembled, consisted of nineteen additional cars; that these cars were backed by the engine into the west "Y" switch and connected by the deceased, with the original part of the train. That after the entire train was gotten together it consisted of an engine, thirty-nine cars, a large number of which were loaded, and a caboose. That the engine was standing about six or eight car lengths west of the "Y" switch on the Asheville pass track, and the caboose on the rear end was standing just in the clear, off the Mooresville main line, in the south switch of the west "Y." That, after the train being so made up, the deceased, in the line of his duties, proceeded toward the rear of the train where, standing on the front end of the cab, he gave the back-up signal, proceeded through the cab to the rear end, and was standing on the rear end, holding on to the signal whistle, and on the lookout, protecting the rear of the train. That he was so situated and standing on the rear of the train because his lantern and brake stick were found inside of the cab, where it was his custom to leave them; that the rules of the company required him to so protect the rear end, and a special order had been issued by the superintendent of the Winston-Salem Division, especially ordering such a protection of the rear end of every train that backed out of the west "Y" on to the Mooresville main line. That this position is also supported by the usual custom in force among railroad men in performing a duty of this kind, and by the further fact that when his body was found the whistle from the rear end of the train that was there for him to use as a signal in making this movement was found near his body.

Plaintiff contends that from all of these facts the indication is that the deceased was, immediately prior to his death, standing on the rear platform, performing his duties in the usual and customary way. That defendant engineer, Duggins, after receiving the signal of the deceased to back the train out of the west "Y," started to back the train from the place where it was standing after being made up, and that when the engine passed the switch of the west "Y" on the old pass track, where the brakeman, Daniels, was standing, that the train had reached a speed in backing of from five to six miles per hour; that immediately after passing the said switch and brakeman, Daniels, the engineer, Duggins, by the manipulation of the controls on the engine, reduced the speed of said train from five to six miles per hour to one mile per hour, or practically a stop, within two car lengths, and that in making such a stop the deceased was thrown from the rear end on to the track. That after

making such a slow-up movement and after throwing the deceased on to the track, the engineer, Duggins, continued to back out of the west "Y" switch, backed over the deceased, and thereby caused his death.

That such a stopping of the train was negligent and careless. That the train, consisting of an engine, thirty-nine cars, and a caboose, was heavily loaded, carrying a maximum tonnage allowed on that road, backing over a slight hump and down a grade; that it contained approximately twenty feet of slack, and that, under these circumstances, such a slowing up of the train did produce an unusual, violent, and unnecessary jerk on the rear of the train, and, furthermore, the kind of jerk that the deceased was not expecting, due to the custom and practice of continuing to back out in this particular movement of the train, and that the action of such stopping on the rear of the train jerked the deceased to the track, and that in continuing to back the train ran over the deceased after he was thrown to the track, thereby causing his death. That such an operation of the engine was negligent, in that such a stop under the existing conditions and the immediate continuation of backing the train could only have been produced by the use of the independent brake on the engine; that the effect of the use of such a brake was to apply the brake on the engine only, thereby stopping the engine immediately, with no braking power applied to the cars, which caused a violent run-out of the slack contained in the train and an especially violent run-out of the train due to the track being down grade, and that such an operation of the train produced a sudden, unusual, violent, and unnecessary jerk on the rear of the train, one not anticipated by the deceased, Pendry, who was riding the rear of the train, who, caught unawares by such a stop, without warning and of such a violent nature, was thrown from the rear end to the track, where he was run over and killed by the continued backing of the train.

That the stop caused the deceased to be thrown from the rear end of the train and the body of the deceased started dragging along the track at approximately five and one-half rail lengths south of the west "Y" switch, designated as point "B"; that these rail lengths carried in length from thirty to thirty-three feet, and one witness testified it was approximately one hundred and seventy-five to two hundred feet south of this switch point; that figuring the length of the train as it was constituted, after being made up, from a point two car lengths south of the west switch on the west "Y," designated as point "C," that the rear end of the train would have been somewhere between one hundred and sixty and two hundred feet south of the south switch of the west "Y," designated as point "B" at the time the stop was made.

That the death of the deceased was due to the negligence of the defendant Southern Railway Company in that the said defendant failed to

maintain its equipment, and especially the whistle on the rear of the said train, in a safe and usable condition; that the said whistle was constructed of a pipe approximately three-fourths of an inch in diameter, extending through a sill in the rear platform of the cab, and supported in such a manner that it was of almost an immovable character, and used by the deceased and other employees as a handhold to protect them from the movements of the train and used especially when it was their duty to be ready to use the said whistle in back-up movements by blowing the same; that the said equipment and whistle was unsafe and in an unusable and dangerous condition, which condition was known, or should have been known, to the defendant, in that the said whistle was made of a defective pipe of a weak and unsubstantial nature, and that when the deceased, Pendry, standing on the rear of the cab, experienced a sudden, violent, unusual, and unnecessary jerk caused by the sudden slowing up or stopping of the train he had hold of the whistle or grabbed hold of the whistle as a handhold; that the said whistle, due to its faulty construction, gave way and, as a result thereof, the movement of the train threw him to the track, where he was run over and killed. That the death of the deceased was due to the negligence of the defendants in that, after bringing the train to a stop to pick up the head brakeman, Daniels, and without warning or a signal from the rear of the train, and after the deceased, W. R. Pendry, was thrown from the said train, that the defendants continued backing, negligently and carelessly, in violation of rules, and ran over the said Pendry before he could recover from the fall from the rear end of the train, thereby causing his death.

The plaintiff contends that from all of this evidence the deceased's death was due to and proximately caused by the negligence of the defendants. That on the third issue the answer should be "No," because that, although the deceased, Pendry, assumed ordinary risks incident to his employment as a flagman by the defendant railroad company, that he did not assume the risk of negligence of the railroad company, and that the acts and conduct on the part of the railroad and the defendant Duggins were not such acts as a man of ordinary prudence would assume in accepting any employment. That on the question of damages, the three issues should be answered for substantial sums.

The widow, Mrs. Ruth Pendry, was absolutely dependent on her husband for a livelihood; that he was a man forty-four years of age, earning from two hundred to two hundred and fifty dollars per month; that he had a number of years seniority with the defendant railroad company, and would shortly have been in a position to earn a much larger sum; that from such earnings, and at such an age, he could reasonably have been expected to live for a long period of time, and contribute during those years large sums to the maintenance, comfort and care of the

widow; that because she has been deprived of such support she has been greatly damaged. That there are two children, dependent upon the efforts of the deceased; that the daughter was fifteen years of age at the time of his death, had reached the ninth grade in school, and could reasonably have expected from her father, with such an income, to be supported, educated, and prepared for life. That there was a son, thirteen years of age, in the seventh grade at school, who could reasonably have expected to have been supported and educated by his father until he was prepared for some vocation in life. That both of these children could reasonably have anticipated, if their father had lived his natural life, to have inherited from him a savings which he accumulated during those years of expectancy.

A map of the locality was introduced in evidence, setting forth in detail the tracks on the "Y," main track, etc.

The evidence on the part of defendants, and their contentions, were contrary to that of plaintiff. They set up the plea of contributory negligence and assumption of risk.

The issues submitted to the jury, and their answers thereto, were as follows:

"1. Was the plaintiff's intestate killed by the negligence of the defendants, as alleged in the complaint? Ans.: 'Yes.'

"2. Did the plaintiff's intestate, by his own negligence, contribute to his own death, as alleged in the answer? Ans.: 'No.'

"3. Did the plaintiff's intestate assume the risk of being killed, as alleged in the answer? Ans.: 'No.'

"4. What amount of damages, if any, is the plaintiff entitled to recover for the widow, Mrs. Ruth Pendry? Ans.: '$12,000.'

"5. What amount of damages, if any, is the plaintiff entitled to recover for the infant, Mary Lillian Pendry? Ans.: '$2,500.'

"6. What amount of damages, if any, is the plaintiff entitled to recover for the infant son, W. R. Pendry, Jr.? Ans.: '$3,000.' "

The court below rendered judgment on the verdict. The defendants made numerous exceptions and assignments of error, and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.

*Elledge & Wells and Parrish & Deal for plaintiff.*
*Manly, Hendren & Womble and W. P. Sandridge for defendants.*

CLARKSON, J. At the close of plaintiff's evidence and at the close of all the evidence, the defendants in the court below made motions for judgment as in case of nonsuit. N. C. Code, 1935 (Michie), sec. 567. The court below overruled these motions, and in this we can see no error.

This case was here on appeal from judgment of nonsuit (see 206 N. C., 873). *Brogden, J.,* wrote a thorough opinion, setting out the facts and law. The nonsuit was overruled and also the opinion evidence which was not allowed in the court below was held to be competent. The Court said, at p. 882: "In other words, was Pendry on the rear of the train? Was there an 'unusual, violent, and unnecessary' jerk of the train that threw him off to his death? These are controverted questions. However, the Court is of the opinion that there was sufficient evidence to be submitted to the jury within the contemplation of the Federal rule."

"A decision by the Supreme Court on a prior appeal constitutes the law of the case, both in subsequent proceedings in the trial court and on a subsequent appeal." *Newbern v. Telegraph Co.,* 196 N. C., 14; *Nobles v. Davenport,* 185 N. C., 162; *Power Co. v. Yount and Robinette v. Yount,* 208 N. C., 182 (184).

We think the evidence on the present appeal is perhaps stronger than that offered by plaintiff on the former appeal, and sufficient to have been submitted to the jury. In fact, defendants say: "While the evidence offered by the plaintiff upon the former appeal was substantially the same as the evidence offered at this trial," etc. The plaintiff was killed on 17 April, 1932. The railroad authorities on the same day sent out a telegram to different employees: "Indications are he fell from the rear of the train or was killed by hoboes." All the evidence shows that he was not killed by hoboes. The evidence of plaintiff indicates that he was on the caboose car, which was on the rear of the train, and plaintiff was on the rear platform of the caboose car in the line of his duty. It also indicates that he was thrown off by the carelessness and negligence of the engineer in the manner of the movement of the train, which produced a sudden, unusual, violent, and unnecessary jerk on the rear end of the train. *Hamilton v. R. R.,* 200 N. C., 543 (558). After being thrown off he was run over and dragged some distance, and near his body was a whistle that was broken from the cab. This whistle was attached to the rear of the caboose car. It was a piece of pipe and showed a fresh break. The evidence indicates that he was holding on to the signal whistle. He had left his lantern and brake stick on the inside of the cab. The rules of the company required him to be on the rear end of the caboose car that backed out of the "Y." The whistle from the rear end of the caboose, used as a signal in making a movement, was found near his body, broken. This was used by the employees as a handhold, and was defective. When the sudden, unusual, violent, and unnecessary jerk took place, the whistle broke and plaintiff's intestate was thrown off the caboose car, run over and dragged. Along the track where he was dragged was found the broken whistle, his pistol, watch, etc. The evi-

dence on the part of plaintiff was clearly sufficient to be submitted to the jury as to how this faithful employee met his death. All the evidence indicated that plaintiff's contentions were correct, and so found by the jury.

One of the main contentions of defendant was that the evidence of certain employees and agents of defendant railroad, taken before the commissioner and read to the jury, constitutes the cornerstone of the plaintiff's case. Without it, the plaintiff cannot conceivably recover. To this line of evidence defendants excepted and assigned error. We do not think they can be sustained.

N. C. Code, 1935 (Michie), sec. 899, abolishes the old equitable bill of discovery. In its place we have section 900: "A party to an action may be examined as a witness at the instance of any adverse party, and for that purpose may be compelled, in the same manner and subject to the same rules of examination as any other witness, to testify, either at the trial or conditionally or upon commission. Where a corporation is a party to the action, this examination may be made of any of its officers or agents." *Chesson v. Bank,* 190 N. C., 187. The statute is remedial and should be liberally construed. *Abbitt v. Gregory,* 196 N. C., 9 (11). The plaintiff complied with the practice and procedure in the application for examination. *Bailey v. Matthews,* 156 N. C., 78 (81). Section 901 provides for examination before trial "at the option of the party claiming it." Section 902: "The party to be examined, as provided in the preceding section, may be compelled to attend in the same manner as a witness who is to be examined conditionally; but he shall not be compelled to attend in any county other than that of his residence or where he may be served with a summons for his attendance. The examination shall be taken and filed by the judge, clerk, or commissioner, as in case of witnesses examined conditionally, and may be read by either party on the trial." *Phillips v. Land Co.,* 174 N. C., 542; *Beck v. Wilkins-Ricks Co.,* 186 N. C., 210 (212). Section 904: "The examination of the party thus taken may be rebutted by adverse testimony."

If defendants desired to introduce the railroad employees and agents that plaintiff had theretofore examined before the complaint was filed, they could have done it. They were in court and defendants could have gotten their evidence. In the trial of a cause the keystone is to find the truth. Defendants had the opportunity to use these witnesses in the trial, but did not do so. We cannot see why they should now complain.

The defendants contend: "In each instance the witness whose testimony had been taken before the complaint was filed and pursuant to the clerk's order was present in court at the time his testimony was read to the jury and under subpœna for the plaintiff. In each instance the court declined to permit the defendants to cross-examine these witnesses.

In each instance the court ruled that the defendants would be permitted to interpose no objection to any part of the testimony of any of these witnesses, to which the defendants had not objected when the examination was had before the commissioners." The defendants had a right, when the testimony was taken, under the statute, to object and except to incompetent evidence, and to cross-examine the witness. If this was not done, the fault lies with the defendants. The defendants say: "We think that the examination taken by the plaintiff before complaint is filed may be used by the plaintiff only as information to enable the plaintiff intelligently to frame a complaint and may not be offered by the plaintiff at the trial of the cause." We cannot nullify the clear language of the statute, "and may be read by either party on trial."

It was in evidence that the court below admitted opinion evidence of experienced trainmen, found by the court to be experts, on the cause and effect of the stopping of a train from a given higher speed to a given lower speed, within a certain distance. This was in accordance with the former holding by *Brogden, J.*, at p. 880, where the opinions are cited to sustain the admissibility of this kind of expert evidence. The testimony of J. C. Burford as to what another freight train did at Barber's Junction did not show such a similarity as to make the evidence permissible under the rule, at least the exclusion was not prejudicial.

The defendant Duggins contends that his liability is not controlled by the Federal Employers' Liability Act. The plaintiff, in the complaint, par. 5, alleged: "That at the time of the plaintiff's intestate's injury, hereinafter referred to, the defendants were engaged in interstate commerce, and the deceased, as an employee of the defendant Southern Railway Company, was also engaged in such commerce." The defendant Duggins in his answer says: "Par. 5. The allegations of article five are admitted."

The issues are those usually submitted in an action under the Federal Employers' Liability Act. There was no objection by defendant Duggins to these issues as to him. He asked no prayer for instruction as to him on the question now presented as to damages. If he ever had any legal rights to the contention now made, he waived them. He cannot now change the theory on which the case was tried in the court below. *Ammons v. Fisher,* 208 N. C., 712 (715). We think the charge as to assumption of risk correct.

Taking the charge as a whole, on every aspect, and on the measure of damages we can see no prejudicial or reversible error. All the evidence indicates that plaintiff's intestate was a faithful employee of defendant railroad for long years, and was killed in the line of his duty.

We have read the long record (276 pages) and able briefs of the litigants. The learned judge tried this long and complicated case with unusual care, following the prior opinion of this Court. We see on the entire record no prejudicial or reversible error.

For the reasons given, in the judgment of the court below we find

No error.

DEVIN, J., took no part in the consideration or decision of this case.

STACY, C. J., dissents.